IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK SHAPOSHNIKOV, individually and as Guardian ad Litem for STUDENT JOHN DOE, STUDENT JOHN DOE by and through his Guardian ad Litem,<br><br>    Plaintiff,<br><br>  v.<br><br>PACIFICA SCHOOL DISTRICT, et al.,<br><br>    Defendants.<br>_____/ | No. C 04-01288 SI<br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

On March 24, 2006, the Court heard argument on defendants' motion for summary judgment. Having considered the arguments of counsel and the papers submitted, and for good cause appearing, the Court hereby GRANTS IN PART defendants' motion.

**BACKGROUND**

From 2002 to 2005, plaintiff was a student at Ingrid B. Lacy Middle School ("Lacy") in the Pacifica School District, where he attended sixth, seventh, and eighth grades. Soon after the start of his sixth grade year, plaintiff began experiencing harassment from his fellow students. Due to his status as a competitive ballroom dancer and his conservative manner of dress,[1] plaintiff's classmates taunted him with comments about his sexuality, such as calling him "gay" or "faggot."

Both plaintiff and his father complained repeatedly about the harassment, which by their

---

[1] The parties agree that these factors were the basis for the harassment. *See* E. Shaposhnikov Decl., ¶ 6; Pl. Oppo. Br. at 4; Harrington Decl., Exhs. A, E.

accounts was an almost daily event. *See* E. Shaposhnikov Decl., ¶ 8; M. Shaposhnikov Decl., ¶ 10. Despite actions taken by the school district, including classroom announcements, contacting parents, and student suspensions, the harassment continued throughout plaintiff's sixth and seventh grades.

Near the end of plaintiff's seventh grade year, his father filed suit against the school district, certain of its employees, ten unnamed students alleged to be plaintiff's harassers, and their parents. The complaint included ten causes of action, including violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, violation of the Equal Protection Clause, violation of federal rights under 42 U.S.C. § 1983, and other state law causes of action. On August 15, 2005, at plaintiff's request, the Court dismissed the unnamed students, their parents, and Lacy as defendants.

The remaining defendants are Pacifica School District; Michele Garside, its former Superintendent; Kitty Mindel, Lacy's Principal; and Thomas Zach, the former Director of Human Resources for Pacifica School District. These defendants now move for summary judgment. Because the Court agrees that plaintiff cannot prove that the administration acted with "deliberate indifference," the Court GRANTS IN PART defendants' motion.

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only point out to the Court that there is an absence of evidence to support the non-moving party's case. *See id.* at 325.

The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct.

1348 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505 (1986).

In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when she] is ruling on a motion for summary judgment." *Id.*

## DISCUSSION

Defendants move for summary judgment on all claims brought by plaintiff.[2] Plaintiff concedes that summary judgment should be granted on his § 1983 claims, but contests the remainder. The Court GRANTS defendants' motion as to the § 1983 claims and the Title IX claims, and DENIES it as to the remaining state law claims.

**I.   Title IX Claims**

   **A.   Discrimination Based upon Peer-to-Peer Harassment**

The major point of contention between the parties is whether plaintiff may proceed with a claim under Title IX. With certain exceptions not relevant here, Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has recognized that Title IX includes a private right of action for damages. *See Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 639-40, 119 S. Ct. 1661, 1669 (1999).

In *Davis*, the Supreme Court held that a suit for damages against a school board could go

---

[2] Defendants also move for summary judgment on any claims brought by Mark Shaposhnikov individually. Plaintiff has indicated that Mark Shaposhnikov only brings claims in a representative capacity on behalf of his son. Accordingly, defendants' motion is GRANTED with respect to any claims brought by Mark Shaposhnikov individually.

3

forward based on a school district's failure to respond to student-on-student harassment. The case involved a fifth-grade girl who was repeatedly harassed by a boy in her class. Among other things, the boy "attempted to touch [plaintiff's] breasts and genital areas and made vulgar statements such as 'I want to get into bed with you' and 'I want to feel your boobs.'" *Id.* at 633. He also "purportedly placed a door stop in his pants and proceeded to act in a sexually suggestive manner toward [plaintiff] during her physical education class" and "allegedly rubbed his body against [plaintiff] in the school hallway in what [plaintiff] considered to be a sexually suggesting manner." *Id.* at 634. The boy was eventually charged with, and pled guilty to, sexual battery for the misconduct. *Id.*

Based on the plaintiff's allegations that the school district had taken no disciplinary action in response to the inappropriate behavior, the Supreme Court held that the plaintiff had stated a cause of action under Title IX. *Id.* at 643. Because Title IX was passed pursuant to Congress's power under the Spending Clause, however, the Supreme Court carefully circumscribed its holding.[3] *See id.* at 640. It held that a school district could only be held liable for peer-to-peer harassment where (1) a student is subject to harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school"; (2) the school district has actual knowledge of the harassment; and (3) the district remains deliberately indifferent to the harassment.[4] *Id.* at 650.

The Court agrees with defendants that plaintiff cannot establish that defendants acted with deliberate indifference in this case. The Supreme Court spent much of its *Davis* opinion emphasizing the limits on its "deliberate indifference" holding, rejecting any suggestion that is was imposing a reasonableness standard on school administrators: "On the contrary, the recipient must merely respond to known peer harassment in a manner that is *not clearly unreasonable*." *Id.* at 648-49 (emphasis

---

[3]Because legislation enacted pursuant to the Spending Clause is "in the nature of a contract," courts "insist that Congress speak with a clear voice, recognizing that there can, of course, be no knowing acceptance of the terms of the putative contract if a State is unaware of the conditions imposed by the legislation or is unable to ascertain what is expected of it." *Davis*, 526 U.S. at 640 (internal quotation marks and alterations omitted).

[4]The Court also limited a school district's liability to "circumstances wherein the [district] exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645; *see also Reese v. Jefferson School Dist. No. 14J*, 208 F.3d 736, 739 (9th Cir. 2000). There is no dispute that this element is present here.

4

added). The Court also cautioned that "courts should refrain from second-guessing the disciplinary decisions made by school administrators," *id.*, and stressed that its holding "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Id.* at 648.

Plaintiff cannot establish that defendants' actions crossed this high bar. As described below, the record reflects that defendants responded to plaintiff's complaints by making classroom announcements, contacting parents, and suspending students who were guilty of harassment. These responses occurred from the early part of the 2002-2003 school year and continued through April 1, 2004, when plaintiff claims the harassment stopped.

The first record of any harassment is contained in a note dated October 7, 2002,[5] from Amy Erio, a former guidance counselor at Lacy, to Brenda Litwin, a sixth-grade teacher, which apparently concerned harassment of plaintiff by his classmates.[6] Smoot Decl., Exh. 6-5. Approximately two weeks later, on October 25, 2002, Erio sent a memorandum to all sixth grade teachers informing them of the harassment problem and instructing them to speak with their classes about the school's harassment policy. Harrington Decl., ¶ 4; Turner Decl., ¶ 2 & Exh. A. On November 4, 2002, Erio sent out a follow up memorandum, identifying plaintiff as the complainant and instructing teachers to notify the administration if they observed any offensive behavior towards plaintiff. Turner Decl., ¶ 5 & Exh. C.

---

[5] It appears the date on this document may be incorrect. The note references both a memo from Erio to sixth grade homeroom teachers and a letter to the parents of Michael Walters, two events that occurred in late October and early November 2002. Erio sent a memo to 6th grade teachers to "discuss IBL's sexual harassment policy" with their homeroom classes on October 25, 2002, and a letter was sent to the parents of Michael Walters on November 1, 2002. *See* Turner Decl., Exh. A; Harrington Decl., Exh. A. Further, the note references the involvement of Kitty Mindel, Lacy's Principal, but Mindel was not involved in the harassment until October 25, 2002. Mindel Decl., ¶ 6. In addition, Litwin wrote Erio on November 7, 2002, specifically mentioning an incident between Walters and plaintiff. Smoot Decl., Exh. 6-17. Thus, it appears that the note may actually have been authored on November 7, 2002, rather than October 7. Nonetheless, the Court will presume, for the purposes of summary judgment, that the document is correctly dated.

[6] Plaintiff asserts that the harassment began from the very beginning of the 2002-2003 school year. The record is not clear of the first day of the 2002-2003 school year, although absence logs produced by plaintiff suggest that it was before September 6, 2002. *See* Smoot Decl., Exh. 6-2. Despite the approximately month-long discrepancy between the parties' accounts of when the harassment started, both parties' factual descriptions of the first incidents of harassment are very similar. *See* Harrington Decl., ¶¶ 4-5; Mindel Decl., ¶¶ 6-8; Shupe Reply Decl., Exh. A at 77-93 (describing picking out offenders from a book of student photographs).

1 In addition, on November 1, 2002, after plaintiff identified four students who had been harassing him,
2 Mark Harrington, Lacy's Vice Principal, sent a letter to the parents of those students, informing them
3 of the problem and asking their help in resolving it. Harrington Decl., ¶ 5 & Exh. A. Plaintiff later
4 reported that the harassment had stopped. *See* Smoot Decl., Exhs. 6-8, 6-15, 6-18, 6-19; E.
5 Shaposhnikov Decl., ¶¶ 10-12.

6 In December 2002, however, the harassment began again. In December 2002, plaintiff reported
7 that a crowd of students had chanted "Eddy is gay" in the locker room during P.E. class. Harrington
8 Decl., ¶ 7; Smoot Decl., Exh. 6-23. Harrington investigated and determined that one student had
9 chanted "Eddy is gay" while the rest had just chanted "Eddy." Harrington then suspended the student
10 who chanted "Eddy is gay." Harrington Decl., ¶ 7 & Exh. C. Later in December, plaintiff reported that
11 another student had thrown gum in his hair. Harrington investigated, but was unable to determine who
12 was responsible. Harrington Decl., ¶ 8 & Exh. D.

13 The record does not reflect any further incidents of harassment until early March 2003, when
14 three boys in plaintiff's math class again made jokes that he was gay. Smoot Decl., Exh. 6-27;
15 Harrington Decl., ¶ 10. In response, Harrington sent a letter to the boys' parents, asking them to explain
16 to their children that "this kind of behavior is harmful, cruel, unacceptable, and illegal." Harrington
17 Decl., Exh, E. Approximately one month later, plaintiff complained that he was being laughed at by
18 students when he delivered attendance sheets to a classroom in his capacity as office aide. Smoot Decl.,
19 Exh. 6-35. A memo from the teacher indicates that she discussed the problem with her students, and
20 "spent about 20 minutes with each of [her] classes reviewing the Ingrid B. Lacy Harassment Policy and
21 leading class discussions about harassment." *Id.* Three other incidents occurred later in April in which
22 students called or implied that plaintiff was gay. Harrington Decl., ¶¶ 13-14. These incidents resulted
23 in the suspension of 6 students. *Id.* at ¶¶ 13-14 & Exhs. J, M, O.

24 The harassment continued through May and June of plaintiff's sixth grade year. In mid-May
25 2003, plaintiff reported that two students had commented that a male student was plaintiff's girlfriend.
26 Harrington Decl., ¶ 15. Harrington admonished the students, but did not punish them further. *Id.* On
27 May 19, 2003, a male student reportedly said "if you let me touch your backpack I will be your
28 girlfriend." *Id.* at ¶ 16. That student was suspended for the comment. *Id.* at ¶ 16 & Exh. Q. On May

6

1   22, 2003, another student pushed plaintiff and laughed at him. *Id.* at ¶ 17. Harrington investigated and
2   determined that the student had grown mad at plaintiff because plaintiff had been teasing him, and that
3   the actions did not constitute sexual harassment. *Id.* He therefore admonished the student, but did not
4   punish him. *Id.* at ¶ 17 & Exh. R.; Smoot Decl., Exh. 6-69. Finally, in early June 2003, Harrington
5   investigated a complaint from plaintiff that another student had screamed "I am going to kill you
6   someday." *Id.* at ¶ 18. Harrington interviewed the student as well as another student and a teacher who
7   were nearby. *Id.* at ¶ 18 & Exh. U. Because no one else had heard the comment, Harrington only
8   warned the student. *Id.*

9   Before the start of plaintiff's seventh grade year, defendants attempted to minimize the chances
10  of harassment by removing a frequent offender from one of plaintiff's classes. *Id.* at ¶ 21 & Exh. V;
11  Smoot Decl., Exh. 7-1. Unfortunately, the harassment did not cease. On September 9, 2003, plaintiff
12  and his father told Harrington that plaintiff had been mocked in his P.E. class the previous day by a
13  student imitating a dancer. Harrington Decl., ¶ 21. Harrington interviewed the student, and believed
14  that student's story that he also took dance classes and was simply demonstrating his own dance steps.
15  *Id.*; Smoot Decl., Exh. 7-9. Thus, no disciplinary action was taken.

16  At the end of October 2003, plaintiff's father informed the school that some students in his P.E.
17  class told plaintiff to "be careful with the ball because you don't want to break your fingernails." Smoot
18  Decl., Exh. 7-35. The record does not reflect that any action was taken in response to this complaint.
19  The next incident occurred on November 12, 2003, when Harrington suspended three students who had
20  rolled up their shirts, pretended to be girls, and waived at plaintiff. Harrington Decl., ¶ 23 & Exh. X.
21  After plaintiff informed Harrington that he did not believe the behavior was directed at him, however,
22  Harrington rescinded the suspensions. *Id.* Plaintiff's father reported the next incident of harassment
23  on November 18, 2003, complaining that another student had sarcastically said "thank you for getting
24  me into trouble" to plaintiff in P.E. class the prior day. *Id.* at ¶ 24. Harrington investigated the incident,
25  and concluded that the student had been genuine and therefore took no disciplinary action. *Id.*

26  On November 21, 2003, plaintiff's father again called the school, complaining that other students
27  had called his son a "prostitute" and a "pimp." Smoot Decl., Exh. 7-49A. Harrington's investigation
28  revealed that the student had suggested that plaintiff dress as a pimp for Halloween, and that plaintiff

7

1  had taken offense at the comment. Harrington Decl., ¶ 25 & Exh. Y. Since the students involved were
2  all friends, Harrington attempted to organize a group mediation session, but the attempt fell through.
3  *Id.*; Smoot Decl., Exhs, 7-58, 7-63.

4  On December 17, 2003, plaintiff had a verbal altercation with another student in which the
5  student called him a "fruitcake," "bitch," and "female bastard." Plaintiff also reported that the student
6  threatened to kill him. Harrington Decl., ¶ 26; Smoot Decl., Exh. 7-66. In response, Harrington
7  suspended the student for two days, and called the police to report the death threat. Harrington Decl.,
8  ¶ 26. The student was also removed from the class. *Id.*

9  The harassment continued into 2004. On January 7, 2004, a teacher witnessed a student pretend
10 to kick plaintiff from behind. She warned the student and took no further action. Smoot Decl., Exh. 7-
11 90. Plaintiff also reported that on February 10, 2004, one male student said to another "Tyler likes Eddy
12 and wants to go out with him." Harrington Decl., ¶ 28 & Exh. BB. Harrington investigated the incident.
13 Despite the fact that he determined that the boys did not know plaintiff and had not meant to tease
14 plaintiff, he determined that their conduct was inappropriate and placed one in in-house suspension. *Id.*

15 Another serious incident occurred on February 25, 2004, when a student told plaintiff that he was
16 going to kill him. *Id.* at ¶ 29. Harrington investigated the incident, and determined that the student had
17 made the statement, but that he had not exhibited any signs that he meant it seriously. *Id.* at ¶ 29 & Exh.
18 EE. The student was suspended for five days and was removed from plaintiff's classes. *Id.* at ¶ 29 &
19 Exh. DD; Smoot Decl., Exh. 7-124. Harrington also spoke to plaintiff's father about the incident, and
20 they decided plaintiff's father would call the police. *Id.* at ¶ 29. Harrington later learned that another
21 student had harassed plaintiff in a different class on that day, accusing him of bankrupting the school
22 district because of his claims against the school. Smoot Decl., Exh. 7-113; Harrington Decl., ¶ 29 &
23 Exh. EE. The student was suspended for three days. Harrington Decl., Exh. EE.

24 On March 4, 2004, plaintiff told Harrington that another student had gotten in an argument with
25 plaintiff, and that he had been about to call student a name when he stopped and stated "I am not going
26 to say anything else because you are probably going to sue me." Harrington Decl., ¶ 30. Harrington
27 investigated the incident and determined that it did not merit any disciplinary response. *Id.* The last
28 incident occurred later in March, when plaintiff complained that students were making comments about

him on an Internet chatroom from the library. *Id.* at ¶ 32. Harrington investigated and could not determine the identities of the offenders, but he had the school's technical staff restrict access to the website. *Id.*

As the above summary demonstrates, defendants' conduct was well above "deliberate indifference." The record establishes that defendants responded to almost every complaint of harassment that they received, resulting in reprimands, letters to parents, and suspensions for the most offensive conduct. Even when school officials took no disciplinary action, the record reflects that they investigated plaintiff's complaints and based their decision not to take action on the results of that investigation. In addition, the school tried alternative ways of controlling the problem, such as sending home an "anti-bullying pledge" to all students at the end of plaintiff's sixth-grade school year, *see* Smoot Decl., Exh. 6-54, and holding school assemblies against harassment, *see* Smoot Decl., Exh. 7-98. Defendants also took their responsibilities seriously. When a teacher was accused of preventing a victim of harassment from reporting it, the school investigated the allegation and advised teachers that this was inappropriate. Smoot Decl., Exh. 6-60. Defendants were also particularly responsive to plaintiff. In late May, 2003, for example, Harrington went through a book of photographs of Lacy's students with plaintiff. Harrington Decl., ¶ 18. Plaintiff identified 28 students who he claimed to have harassed him. Harrington conducted a detailed interview with each one. *See id.* at Exhs. S, T.

Plaintiff maintains that the harassment was a daily occurrence, that the record vastly understates the amount of harassment he experienced, and that school administrators did not respond to all of the harassment he reported. E. Shaposhnikov Decl., ¶ 17. There are two problems with this argument.[7] First, plaintiff has failed to identify with particularity a single incident in which defendants ignored his complaints. Indeed, plaintiff's own recollection of the incidents of harassment he experienced is very similar to the events reflected in the school's record. *See* Shupe Reply Decl., Exh. A.

Second, and more importantly, plaintiff has produced no evidence to show that defendants were aware of the additional incidents of harassment. To the contrary, the record reflects that defendants

---

[7]A third problem is that the allegation that defendants ignored his complaints is not particularly believable, given that the record is replete with evidence that defendants responded to the allegations they were presented with. As this is the summary judgment stage, however, the Court must accept plaintiff's allegations as true.

9

responded to almost every incident they were aware of. During plaintiff's seventh grade year School Counselor Chido Garcia sent regular updates to plaintiff's father on any harassment incidents. *See* Garcia Decl., Exh. A. These updates report on the incidents described above, and repeatedly state that the school district is unaware of any additional incidents of harassment. *Id.* In this respect, plaintiff's father may have prevented defendants from adequately monitoring the situation by repeatedly prohibiting them from speaking with his son about the harassment outside of his presence. *See, e.g.*, Smoot Decl., Exhs. 6-33, 6-34 ("Mr. Shaposhnikov called to say that any conversation regarding the harassment of Eddy . . . should be only in the presence of himself or his attorney."), 6-52 (letter from plaintiff's attorney stating "[i]n particular, do not interrogate Master Shaposhnikov without his father or the undersigned present"), Smoot Decl., Exh. 7-10 (father telling school counselor not to talk to plaintiff), 7-24 (phone message for Harrington from plaintiff's father requesting that he not speak with plaintiff). This further demonstrates the unlikelihood that defendants were aware of other incidents of harassment that are not contained in the record. *See id.* at Exhs. 7-31 (letter to plaintiff's father from Mindel stating "I am very concerned about the communication barriers you are placing between Eddy and my staff. These are preventing us from doing our job."), 7-96 (letter to plaintiff's father stating that his restrictions are interfering with defendants' ability to address harassment).

Even accepting plaintiff's description of the amount of harassment as true, however, the Court finds that defendants were not deliberately indifferent as a matter of law. Defendants repeatedly attempted to remedy the harassment, and their attempts were not so exiguous as to be "clearly unreasonable." *Gabrielle M. v. Park Forest-Chicago Heights, IL Sch. Dist.*, 315 F.3d 817, 825 (7th Cir. 2003) ("*Davis* does not require funding recipients to remedy peer harassment. *Davis* disapproved of a standard that would force funding recipients to suspend or expel every student accused of misconduct. All that *Davis* requires is that the school not act *clearly unreasonably* in response to known instances of harassment.") (internal citations omitted). To the contrary, the record reflects that defendants bore a legitimate concern for plaintiff and genuinely wanted the harassment to stop. While defendants' actions were apparently ineffective, defendants cannot be said to have been indifferent.

Of course, it is true that "[w]hile the failure to remedy peer harassment may not, standing alone, be a sufficient basis for deliberate indifference, an otherwise sufficient response may become

10

1 unreasonable where the school district has knowledge that its remedial action is inadequate and
2 ineffective." *See Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000). And the
3 harassment continued against plaintiff unabated for two years before it finally stopped. In this case,
4 however, the Court cannot find that defendants' ineffective remedial action became clearly
5 unreasonable. It is undisputed that the harassment remained verbal, and, with minor exceptions, never
6 escalated into physical abuse. Moreover, it is undisputed that the harassment did not significantly
7 interfere with plaintiff's education[8]; indeed, plaintiff finished with a better than 4.0 GPA, at the top of
8 his class. In light of these two facts, the Court believes that, as a matter of law, defendants' actions
9 cannot be said to have been clearly unreasonable. Accordingly, the Court GRANTS defendants' motion
10 for summary judgment.

### B.    Retaliation

To establish a retaliation claim under Title IX, plaintiff must show that he was retaliated against because he complained of sex discrimination. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, --, 125 S. Ct. 1497, 1510 (2005) (recognizing cause of action under Title IX for retaliation). The Court has not found any case that defines "retaliation" under Title IX. In the employment context, however, retaliation means any action "reasonably likely to deter employees from engaging in protected activity." *Pardi v. Kaiser Foundation Hospitals*, 389 F.3d 840, 850 (9th Cir. 2004).

Plaintiff has not alleged any actions that could satisfy an analogous standard in the Title IX context. The only actions he alleges were taken against him[9] were that a teacher told him not to report harassment because it was harming his career, that he was forced to fold anti-bullying mailers during his period as office assistant, and that the school announced that he had filed a lawsuit and should be

---

[8] While plaintiff was removed from P.E. class for a period during 2003 because of the harassment, neither he nor his father claims to have objected to the move. Shupe Reply Decl., Exh. A, at 91-92; E. Shaposhnikov Decl., ¶ 14; Shupe Decl. Exh. A at 110.

[9] Plaintiff also alleges that he was retaliated against because of defendants' "apologetic" communications with the parents of the harassers and because one of the harassers had his suspension reduced and was placed in a "peer helper" class. The Court does not agree that these actions can qualify as retaliation, as they did not involve plaintiff. Indeed, allowing plaintiff to base his retaliation claims on these allegations of lax enforcement would allow him to base his retaliation claims on conduct indistinguishable from his claim of deliberate indifference.

left alone. The Court finds that, as a matter of law, these actions are not sufficient to constitute retaliation.

## II.     State Law Claims

The Court agrees with defendants that the school district has Eleventh Amendment immunity that shields it from plaintiff's state law claims. *See Belanger v. Madera Unif. Sch. Dist.*, 963 F.2d 248, 254 (9th Cir. 1992) (finding that California school district was entitled to Eleventh Amendment immunity). As plaintiff has not shown or argued that the school district waived that immunity, defendants' motion is GRANTED with respect to the state law claims against Lacy.

As to the individual defendants, the Court agrees with plaintiff that these defendants have not carried their burden on summary judgment. Indeed, defendants' opening brief includes only a two sentence paragraph asserting, in conclusory fashion, that there is no evidence to support plaintiff's state law claims. This is inadequate to meet defendants' summary judgment burden.

The Court notes, however, that the initial briefing on these topics was made more difficult by the number and breadth of plaintiff's allegations, including the § 1983 allegations which defendants were required to address but which plaintiff ultimately conceded. Under these circumstances the Court will request that the parties submit limited further briefing on the issue of the state law claims: whether the state law claims survive summary judgment and, if so, whether this Court should continue to exercise jurisdiction over them. **Defendants may submit such briefing, limited to 10 pages of text, no later than April 21, 2006. Plaintiff may respond no later than April 28, 2006.** The matter will thereupon be submitted.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART defendants' motion for summary judgment (Docket No. 111). The motion is GRANTED as to plaintiff's Title IX and 42 U.S.C. § 1983 claims. The motion is also GRANTED with respect to plaintiff's state-law claims against Pacifica School District. In addition, the Court GRANTS defendants' unopposed motion for summary judgment as to any claims brought by Mark Shaposhnikov

individually.

The Court will consider the question of the state law claims, and also the question of whether this Court should continue to exercise jurisdiction over the state claims, upon receipt of the parties' further briefing as set out above. The trial date is continued to May 22, 2006, and the pretrial conference is continued to May 16, 2006.

**IT IS SO ORDERED.**

Dated: April 10, 2006

SUSAN ILLSTON
United States District Judge